IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ABDALLAH GENDIA, | : | |
| | : | |
| Plaintiff, | : | Civil Action |
| | : | No. 20-1104-WB |
| v. | : | |
| | : | |
| DREXEL UNIVERSITY, | : | |
| | : | |
| Defendant. | : | |

**AMENDED COMPLAINT (CIVIL ACTION)**

**I.  INTRODUCTION**

1. This action is for damages and other relief arising from defendant's violation of plaintiff's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 [hereinafter "Title IX"].

**II.  JURISDICTION AND VENUE**

2. This Court has jurisdiction over Plaintiff's federal cause of action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1334.

3. Venue is properly laid in this District, as all parties are found therein and all acts and events giving rise to the complaint occurred therein.

**III.  PARTIES**

4. Plaintiff Abdallah Gendia is an adult male who, at all times relevant hereto and up until the time of his separation from it, attended Drexel University.

5. Drexel University is a private university that receives federal funding.  At all times material hereto, Drexel University (hereinafter "Drexel"), by and through its chief policy making officials, agents, employees, and/or representatives, promulgated, maintained,

1

and implemented the policies, practices, and procedures referenced herein, including those related to Title IX

6. Nonparty "Mary Roe" is an adult female who, at all relevant times, was a student attending Drexel and whose identity is known to defendant but is referenced herein as Mary Roe to protect her privacy.

## IV. ALLEGATIONS OF MATERIAL FACTS

7. In or about summer 2016, Gendia and Mary Roe (hereinafter "Roe") began a romantic relationship.

8. At that time, Gendia was matriculating full-time at Drexel, and had no prior criminal record.

9. Gendia and Roe ended their relationship in or around December 2017.

10. Nevertheless, after ending their romantic relationship they continued to communicate, and to spend time with each other.

11. The relationship between Gendia and Roe was characterized by emotional volatility, including a cycle of separation and reconciliation, but not violence.

12. Over the course of their relationship, and continuing after it ended, Roe publicly expressed willingness to engage in, and did in fact engage in, self-harm, including "cutting."

13. On March 1, 2018, after her relationship with Gendia had ended, Roe filed a complaint with Drexel against Gendia, alleging acts of intimate partner violence, stalking, and sexual harassment.

14. The bases for Roe's complaint were: (1) an allegation that Gendia had choked her in August 2017; (2) an allegation that Gendia threatened to kill her dog in August 2017; and

(3) an allegation that Gendia had punched her in the head, causing her injury, in February 2018.

15. The allegations that Gendia had choked and punched Roe were unfounded and untrue, and Gendia did not threaten Roe that he would kill her dog.

16. Gendia filed a complaint against Roe two days later, on March 3, 2018, alleging acts of harassment based on citizenship status, religion, national origin, and race, and acts of intimate partner violence and stalking, all of which were documented in written correspondence.

17. The bases for Gendia's complaint were: (1) an allegation that Roe eavesdropped on conversations inside his apartment while she was outside; (2) allegations that Roe sent harassing text messages threatening to destroy his property and disparaging him on the basis of race, religion, citizenship status, and national origin, and (3) an allegation that she waited outside his apartment door and then attempted to punch him in the face.

The August 2017 Incidents

18. During their relationship, in August 2017, on a date not presently known, Gendia and Roe attended a party at a fraternity house at which fraternity Gendia was a member.

19. While at the party, Gendia and Roe got in a verbal argument, and Gendia was asked to leave, which he did.

20. Roe also left and returned to her apartment with a group of friends, where they drank alcohol and smoked marijuana.

21. Roe was consuming alcohol with her cohort.

22. At some point, Roe left her apartment and went to Gendia's.

23. At that time, Roe was visibly intoxicated, as she could not keep her balance and was slurring her speech, and was visibly upset.

24. At Gendia's apartment, Roe verbally confronted Gendia in front of his friend.

25. Later, Roe alleged that while talking to Gendia outside his apartment, (a) he pinned her against the wall, (b) choked her, (c) such that she could not breathe.

26. Gendia did not touch her except to catch her to prevent her falling and injuring herself.

27. Roe left a slipper in front of Gendia's apartment, which he soon thereafter returned.

28. On a separate occasion in August 2017, during a phone call with Roe, Gendia made a comment about her dog, and immediately thereafter disavowed any actual, serious intention of harming it.

29. Gendia's comment about Roe's dog was an idle threat borne of frustration during a phone call that lasted over an hour, qualified many times as such, with no objective indication that the comment could be understood as anything else.

30. Roe did not tell anyone, except her friend who she was with during her phone call with Gendia, about the comment or conversation until her March 1, 2018 complaint.

31. Roe's dog was never harmed or put in harm's way.

February 2018 Incident

32. In February 2018, Gendia was living in an apartment at 3512 Lancaster Avenue, a multi-unit property primarily renting to students.

33. At that time, Roe lived elsewhere.

34. On or about February 24, 2018, Roe came to 3512 Lancaster Avenue, where her friend lived, and without began texting Gendia without solicitation from him.

35. Her messages to Gendia indicated she was at 3512 Lancaster and was upset with him, and included profanity-laden threats to harm him and his property.

36. When Gendia returned to his apartment, he was accompanied by a friend.

37. Roe confronted Gendia, in the presence of his friend, on the steps leading to his apartment, which staircase was near a common area, and began a verbal altercation.

38. Roe, standing approximately two steps above Gendia, attempted to hit him.

39. Gendia braced himself and covered his head.

40. She missed, lost her balance, and fell, injuring her head.

41. Gendia and his friend called 911 and brought Roe inside his apartment.

42. Gendia administered basic care to Roe while waiting for medical assistance to arrive.

43. Gendia accompanied Roe to the hospital, where she was treated with stitches for her lacerated forehead .

44. A report of the incident noted Roe's apparent intoxication during the foregoing incident.

45. Roe falsely reported to the hospital and the Drexel Police Department that her injury was the result of Gendia punching her.

46. Gendia was then arrested.

47. Three days later, Roe further embellished the incident by alleging that Gendia was holding keys between his fingers when he struck her.

48. Gendia was charged with several crimes related to Roe's false allegations pertaining to this February 24 incident.

49. Prior to July 5, 2018, Gendia was ultimately acquitted of all charges.

Title IX Investigation and Process

50. After receiving Roe's Title IX complaint, as set forth hereinabove, Drexel began investigating the incident.

51. That investigation was undertaken by Drexel despite its knowledge that Gendia was facing criminal charges relating to one of the incidents alleged by Roe, and had been provisionally banned from campus after an ex-parte restraining order was entered for the benefit of Roe and against him.

52. As a result, Gendia missed the end of his academic term and was unable to complete final exams.

53. Gendia was advised that the provisional ban from campus would be lifted if the restraining order was appropriately modified.

54. Gendia, through counsel, successfully obtained a modification of the restraining order that, by its terms, would not bar him from Drexel's campus.

55. Gendia came to campus to deliver the modified restraining order, as he had been directed by Drexel administrators to do.

56. However, he was advised by Drexel that he was permanently banned from campus, pending the outcome of the Title IX investigation, because, by following Drexel's directive to deliver the modified restraining order, he had "violated" the provisional ban.

57. Gendia's ban from campus had the effect of inhibiting his ability to defend himself and prove his affirmative allegations.

58. Drexel determined to impose an unconditional ban on Gendia's access to campus knowing the ban would detrimentally affect his ability to defend himself and expose him to greater risk of discipline.

59. No similar restrictions were placed on Roe although she too was accused of violence and harrasment directed at Gendia.

60. In an early meeting with Jenna Perez, Gendia denied the allegations that he had hit Roe, and Perez responded that she believed Roe and Gendia would be responsible for disproving the allegations against him if he was to avoid discipline.

61. At all times material hereto, Perez and Drexel administrators knew that, because of the parallel criminal proceeding and the meritless allegations against him, Gendia could not respond to Drexel's requests for information from him without jeopardizing his Firth Amendment rights.

62. After his acquittal, Gendia demanded Drexel have an expert evaluate his claim that Roe's injury to her head was the result of the blunt force trauma of falling to the ground off-balance.

63. Drexel did retain an expert, and, consistent with Drexel's pre-determined outcome, offered an opinion to undermine Gendia's claim that Roe fell, specifically opining that she did not fall.

64. Drexel shared the expert's report with Gendia just days before the adjudicatory hearing and refused to allow him time to produce a rebuttal report.

65. The investigation led by Perez was biased, incomplete, and materially defective in many regards, including but not limited to:

    a. Assuming the veracity and credibility of Roe's account before the investigation had begun;

    b. Assuming Gendia's guilt from the outset;

    c. Maintaining an investigatory and adjudicatory system that favors female students at the expense of male students.

    d. Asking gender-biased questions of Gendia, framed in such a way that he was asked to disprove Roe's account (i.e., after Gendia offered an explanation of his interaction with Roe that resulted in her injury, his account was treated dismissively and he was asked aggressively "then how did she get cut?");

    e. Penalizing Gendia, by finding it probative of his guilt or fault, that he did not respond to requests for information by Drexel administrators, despite facing related criminal charges and that such requests could not be honored without jeopardizing Gendia's Fifth Amendment rights.

    f. Excluding non-relevant evidence offered by Gendia while admitting non-relevant evidence from Roe, i.e., the investigation report did not include Gendia's documented evidence of Roe's acts of self-harm or comments about brown people/professors, but included Roe's unsubstantiated testimonial evidence of Gendia's self-harm.

66. Throughout the investigation, Perez and Drexel were aware of its deficiencies, including but not limited to its failure to consider Roe's lack of credibility.

67. Drexel's Title IX training materials for taking reports and carrying out investigations on campus sexual assault inherently portray women as the victim of men.

68. Drexel has also distributed to students on campus documents that titled "Date Rape/Acquaintance Rape" that portray only women as victims of sexual assault and only men as perpetrators. The document provides "Advice for Women" to avoid rape while

providing "Advice for Men" to "[t]hink about whether you really want to have sex with a woman who does not want to have sex with you."

69. Drexel's investigation and subsequent adjudication was consistent with its own operating procedures and policies, which resulted in unfair, discriminatory, and erroneous outcomes. The defects in Drexel's policies which produce unfair, discriminatory, and erroneous outcomes include:

   a. Permitting a Title IX investigation to occur in tandem with a criminal prosecution;

   b. A practice effectively requiring accused students to give statements and/or testimony about the incident, even when the accused is subject to criminal prosecution for the same facts;

   c. A policy or practice permitting an inference of guilt from an accused student's silence or refusal to participate in the Title IX investigation

   d. Permitting the imposition of greater discipline when an accused student maintains his or her innocence

70. On June 26, 2018, an administrative hearing was held on the charges against both Gendia and Roe.

71. While each was permitted to have an attorney present, their attorneys were not permitted to cross-examine witnesses.

72. On July 5, 2018, Drexel found against Gendia regarding Roe's complaints against him – that he had choked her, harassed her by threatening to kill her dog, stalked her with unwanted communications, threatened to engage in self-harm unless she continued their relationship, and punched her in the head causing a laceration.

73. Drexel found Roe stalked Gendia outside his apartment, harassed Gendia with threatening text messages, and stalked him outside his apartment then attempted to assault him.

74. The evidence does not support the finding of the adjudicator, a problem further compounded by the evidence withheld from the adjudicator by Drexel.

75. Drexel's report, written by hearing adjudicator Kelley Hodge, because it supported Drexel's pre-determined outcome and favored Roe while disadvantaging Gendia, accepted the testimony of a police officer that directly contradicted an earlier report written by the same officer.

76. On July 20, 2018, Drexel notified Gendia that he would be expelled and that Roe would be suspended for approximately six months.

77. Gendia and Roe each appealed their punishments.

78. On August 10, 2018, Drexel found the term of Roe's suspension was too severe, and modified its start date to protect her "co-op credits," and found Gendia's appeal was without merit and denied it.

79. As a result of the foregoing, Gendia failed a term's final exams (because he was not permitted on campus) and missed at least one additional term before his expulsion, suffered emotional and psychological harm, suffered harm to his personal and academic reputations, suffered harm to his opportunities to continue to pursue academic and employment opportunities, including a loss of earning capacity resulting from the delay in his education, was denied the benefits of the education at his chosen school, and retained an attorney for his defense against the disciplinary charges against him, all at great expense.

## V.     CAUSES OF ACTION

### COUNT ONE
### (TITLE IX)

80. Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

81. Title IX prohibits discrimination on the basis of sexing education programs or activities operated by recipients of federal financial assistance.

82. Drexel is an education program receiving Federal financial assistance.

83. Title IX bars the imposition of discipline against students where gender is a motivating factor in the decision to discipline.

84. The implementation of Drexel's policies as set forth more fully above comprise discriminatory against plaintiff, a male student, in favor of a female student, in violation of Title IX.

85. At all times material hereto, Perez and other Drexel agents and employees were "appropriate persons" as the term is construed under Title IX who had actual knowledge of the discriminatory treatment of Gendia, but took no action to halt or abate its effect, for which Drexel is therefore liable.

86. Plaintiff suffered the harms and damages alleged herein as a result of Drexel's violation of Title IX.

### COUNT TWO
### (BREACH OF CONTRACT)

87. Plaintiff incorporates each of the foregoing paragraphs as if set forth fully herein.

88. Drexel's written Title IX policy ("OED-3")[1] promises to provide a "fair adjudicatory and resolution processes" and to "maintain[] fairness for all parties [involved]."

---

[1] The policy is available here: https://drexel.edu/~/media/Files/oed/PDF/OED3-Drexel%20Title%20IX%20Policy%20Final.ashx?la=en

89. It further promises that any investigation will be "thorough, impartial and fair."

90. It further promises that any sanction imposed under the policy is subject to review "To determine whether the original adjudication process was conducted fairly."

91. The same policy pledges to "provid[e] an environment free from discrimination, including discrimination based on sex and gender."

92. In addition to the foregoing promises, Drexel has a common law duty to provide Gendia with fundamental fairness.

93. The foregoing promises and the common law duty set forth more fully above established a contractual relationship between Gendia and Drexel, the former providing the latter with consideration in the form of tuition and fees in return for the aforementioned promises and duty.

94. For the reasons set forth more fully above – e.g. by failing to provide a fundamentally fair procedure capable of establishing facts without prejudice and with an opportunity to cross-examine witnesses – Drexel breached its promises and common law duty to treat Gendia fairly and to provide him fundamental fairness, thereby breaching its contract with Gendia.

95. Plaintiff suffered the harms and damages alleged herein as a result of Drexel's breach of contract.

## VI.   JURY DEMAND

96. Plaintiff demands a jury determination of all issues so triable.

## VII.   PRAYER FOR RELIEF

WHEREFORE, plaintiff asks the Court to enter judgment in his favor and against defendant, and grant him the following relief:

a. An award of general and compensatory damages;

b. Reasonable counsel fees pursuant to 42 U.S.C. §1988(b);

c. Such other relief as the Court deems just and equitable.

        Respectfully submitted,

        WILLIAMS CEDAR

        */s/ CHRISTOPHER MARKOS*
        Christopher Markos, Esq.
        PA ID No. 308997
        Gerald J. Williams, Esq.
        PA ID No. 36418
        1515 Market Street, Suite 1300
        Philadelphia, PA 19102
        P: 215-557-0099
        F: 215-557-0673
        cmarkos@williamscedar.com
        gwilliams@williamscedar.com
        *Attorneys for Plaintiff*

Dated: July 10, 2020

CERTIFICATE OF SERVICE

      I, Christopher Markos, Esquire, hereby certify that on this date, I served a copy of the foregoing document, via the Court's Electronic Case Filing system, and that it is available for viewing and downloading therefrom by Counsel for defendants, in accordance with Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5.1.2.

<u>*/s/ Christopher Markos*</u>
Christopher Markos
Attorney for Plaintiffs

Dated: <u>July 10, 2020</u>